IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ONE SOURCE TECHNOLOGY, | ) | CASE NO.: |
| LLC dba ASURINT | ) | |
| 1501 Euclid Avenue, Suite 900 | ) | JUDGE: |
| Cleveland, Ohio 44115, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
|   v. | ) | |
| | ) | |
| ROBERT DiFILIPPO | ) | |
| 1386 Lakewood Avenue | ) | |
| Lakewood, Ohio 44107, | ) | |
| | ) | |
|     Defendant. | ) | |
| | ) | |

---

**COMPLAINT FOR MONEY DAMAGES,
DECLARATORY JUDGMENT, INJUNCTIVE RELIEF,
AND OTHER EQUITABLE RELIEF**

**(Jury Demand Endorsed Hereon)**

---

Plaintiff One Source Technology, LLC dba Asurint ("Asurint"), for its

Complaint against Defendant Robert DiFilippo ("Mr. DiFilippo") alleges as

follows:

1.  This case involves the intentional and malicious misappropriation of

corporate trade secrets, including confidential and proprietary information,

by an employee, and the use of that information to file a provisional patent

application, and a subsequent patent application, that falsely claim

ownership of the claimed invention. Asurint seeks declaratory relief,

{K0226630.1}

injunctive and other equitable relief, compensatory and punitive damages, and its attorneys' fees and costs.

## The Parties

2.  One Source Technology, LLC is a Delaware limited liability company with its principal place of business at 1501 Euclid Avenue, Suite 900, Cleveland, Ohio 44115, and which does business as Asurint.

3.  Mr. DiFilippo is an individual and a resident of the state of Ohio, residing at 1386 Lakewood Avenue, Lakewood, Ohio 44107.

## Jurisdiction and Venue

4.  This action arises under the Patent Laws of the United States, 35 U.S.C. §§ 1 – 376, the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 – 2002, the Lanham Act, 15 U.S.C. §§ 1051 – 1141n, and pendent Ohio statutory and common law. The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1338, 1367, and 2201(a).

5.  Venue is proper pursuant to 28 U.S.C. § 1391(b), because the written Agreement upon which Asurint is suing was entered into in this District, a substantial part of the events that gave rise to the claims took place within the District, Mr. DiFilippo's tortious conduct was directed at this District, Asurint was injured by Mr. DiFilippo's tortious conduct in this District, and, Mr. DiFilippo resides in this District.

{K0226630.1}

## Introduction

6.  Asurint is an employment background screening company. It develops, markets, and sells full-service background screening and monitoring services, including but not limited to criminal backgrounds, credit, professional license verifications, social security verifications, employment and education histories and verifications, and motor vehicle record checks and drug screening, for employers, governments and governmental agencies, non-profit organizations, and others. Because the background screening industry is crowded and competitive, Asurint's value is in the accuracy of the information it provides its customers.

7.  Asurint is the exclusive inventor and owner of iMARC™, a proprietary technology Asurint developed, which addresses the problems of false negatives and false positives in background checks. iMARC is the core computer process that enables Asurint to verify the accuracy of its background checks, and which sets Asurint apart from its competitors in the highly competitive background screening industry. Throughout this Complaint, the terms "iMARC" and "the technology" refer to the technology and processes that underlie development and implementation of that technology.

8.  Asurint's research and development of iMARC dates back to 2002, more than three years before Mr. DiFilippo became associated with Asurint in any manner.

-3-

9.  In 2005, during Asurint's formative stages, Mr. DiFilippo and Asurint began exploring whether the parties wanted to enter into an employment relationship. At that time, Asurint and Mr. DiFilippo signed a Mutual Non-Disclosure Agreement (the "NDA") (attached as Exhibit 1), in which Mr. DiFilippo agreed to maintain the confidentiality of Asurint's confidential information and trade secrets.

10. Under the protection of the NDA, Asurint disclosed to Mr. DiFilippo details about Asurint's trade secrets, and confidential and proprietary information, including iMARC's invention, development, design, future plans, and technology.

11. Following months of discussions, Asurint hired Mr. DiFilippo as its Director of Data Integration and Senior Database Administrator. In that role, Mr. DiFilippo was responsible for creating and maintaining all of the myriad data sources used by Asurint's proprietary background screening application. He also managed a team of developers that acquired and converted the data sources, and additionally supported the development team in maintenance of the databases and other programming needs.

12. In connection with his hiring and as condition of his employment, on March 14, 2006, Mr. DiFilippo signed a Non-Competition and Non-Disclosure Agreement (the "Agreement") (attached as Exhibit 2), in which he agreed, among other things, to maintain the confidentiality of Asurint's trade secrets, including its confidential and proprietary information.

-4-

13. During the course of his employment, Mr. DiFilippo had access to Asurint's trade secrets and confidential and proprietary information related to iMARC.

14. On July 28, 2008, Mr. DiFilippo abruptly resigned from Asurint.

15. Recently, Asurint learned that a mere seven weeks after his resignation, Mr. DiFilippo filed with the United States Patent and Trademark Office (the "USPTO"), a provisional patent application for an invention, the contents and claims of which are materially identical to iMARC, on which he worked while employed by Asurint. Six months later, he filed a patent application claiming the same invention.

16.  This is an action against Mr. DiFilippo for statutory damages, compensatory damages, punitive damages, pre-judgment interest, attorneys' fees, declaratory relief, injunctive relief, and other equitable relief.

17. This action arises out of Mr. DiFilippo's breach of the Agreement, wrongful misappropriation of Asurint's trade secrets and confidential information, and Mr. DiFilippo's misuse of Asurint's computers and computer systems.

## Factual Allegations

### *The Development of iMARC*

18. From 2002 to present, Asurint expended considerable time, money, and resources into the research and development of a proprietary technology to address the problems of false negatives and false positives in background

checks. At all times, Asurint maintained control and confidentiality over this invention.

19. In 2002, Asurint began to research how to organize the data points from various pieces of background search information into a scoring model that would assist in the verification of the accuracy of the underlying data.

20. By January 2004, Asurint had formally documented this research into a technical design document.

21. On December 2, 2004, Asurint made its first comprehensive attempt to combine the prior 2½ years of research into a conceptual working document. This document was organic, and Asurint continued to add to it and refine it over time, through 2008. This research, and its supporting documentation, ultimately formed the basis for Asurint's proprietary iMARC scoring model.

22. Asurint continued its research and development through 2005.

*Trade Secret Protections*

23. Asurint takes steps to protect its trade secrets and confidential and proprietary information.

24. For example, Asurint requires all employees who may come in contact with or otherwise learn of Asurint's trade secrets, and confidential and proprietary information, to sign a Non-Competition and Non-Disclosure Agreement, which is identical to that which Mr. DiFilippo signed as a condition of his employment with Asurint. Asurint will not employ someone who may come in contact with or otherwise learn of Asurint's trade secrets,

{K0226630.1}

including other confidential and proprietary information, if he or she refuses to sign such an agreement.

25. Asurint requires all non-employees who may come in contact with or otherwise learn of Asurint's trade secrets, and confidential and proprietary information, to sign a Non-Disclosure Agreement, which is either identical or materially similar to that which Mr. DiFilippo signed while negotiating his employment with Asurint.

26. All employees receive a copy of, and sign a receipt for, Asurint's employee handbook, which contains policies covering employees' handling of Asurint's confidential information and expectations and responsibilities regarding Asurint's computers and computer systems.

27. Asurint limits the disclosure of its trade secrets, and confidential and proprietary information, only to certain employees and only on a need to know basis.

28. Asurint maintains all information relating to its trade secrets electronically in password-protected files.

29. Asurint marks its all of its trade secrets, and confidential and proprietary information, as "Confidential."

*Asurint's Relationship with Mr. DiFilippo*

30. In late 2005, Asurint approached Mr. DiFilippo with an employment opportunity.

-7-

31. On December 31, 2005, Mr. DiFilippo executed the NDA with Asurint. (Exhibit 1). The purpose of the NDA was for Mr. DiFilippo to evaluate a potential employment opportunity with Asurint.

32. The NDA defined all Asurint technical or business information as "Confidential Information," and prohibited Mr. DiFilippo from disclosing the Confidential Information to third parties, or copying the Confidential Information without Asurint's authorization. Specifically, and in pertinent part, the NDA provided:

> 1. Purpose. This Agreement is made for each party to disclose to the other, during the term of this Agreement, such technical and business information as the disclosing party may elect to disclose, so the receiving party may review and use the same solely for the purpose of considering the merits of a potential business arrangement with the disclosing party (the "Business Opportunity") under terms that will protect the confidential and proprietary nature of such information.

> 2. Confidential Information. As used herein, "Confidential Information" will mean any and all technical or business information, including without limitation third party information, furnished or disclosed, in whatever form or medium (including without limitation tangible, written, intangible, visual and oral), by one party to the other, including but not limited to (a) information regarding patents and patent applications, copyrights, trade secrets and other proprietary information (including without limitation works of authorship, software programs, software source documents, algorithms, formulae, ideas, techniques, know-how, processes, inventions, apparatuses, equipment, models, sketches and drawings), (b) product/service specifications and the existence of and information concerning the research, experimental work, development, design details and specifications of a party's proposed and/or future products, (c) engineering information, manufacturing information, procurement requirements, purchasing information, customer lists, financial information, information regarding investors, employees, business and contractual relationships, business forecasts, sales and

-8-

merchandising plans, marketing plans and (d) information regarding third parties. All Confidential Information will remain the property of the disclosing party and no license or other rights in the Confidential Information is granted by virtue of this Agreement.  All information is provided "AS IS" and without any warranty, express, implied or otherwise, regarding its accuracy or performance.

3. Obligations. Each party agrees to request from the other only that Confidential Information that is reasonably necessary to enable the receiving party to conduct and complete its evaluation of the potential Business Opportunity. In handling the other party's Confidential Information, each party agrees: (a) to use the other's Confidential Information solely for the purpose of evaluating the Business Opportunity; (b) to use reasonable efforts to protect the confidentiality of the other's Confidential Information; (c) not to make disclosure of any of the other's Confidential Information to anyone except those employees, consultants and professional advisors of such party to whom disclosure is necessary for the purposes stated above (whose identity has been made known to the disclosing party); (d) to appropriately notify such employees, consultants and advisors that the disclosure is made in confidence and to require them to keep the same in confidence in accordance with the terms and conditions of this Agreement; and (e) not to copy the other's Confidential Information unless specifically authorized. Each party agrees that in the event permission is granted by the other to copy Confidential Information, or that copying is otherwise permitted hereunder, each such copy will contain and state the same confidential or proprietary notices or legends, if any, that appear on the original.

33. From December 31, 2005, through March 14, 2006, in reliance on the terms, conditions, covenants, and promises of the NDA, Asurint disclosed to Mr. DiFilippo its confidential and proprietary trade secret information, including Asurint's nascent iMARC criminal background investigation technology and scoring system.

34. Following nearly two months of discussions, on February 22, 2006, Asurint offered to hire Mr. DiFilippo.  Mr. DiFilippo accepted the offer and

started his employment on March 6, 2006. A copy of the offer letter signed by Mr. DiFilippo is attached as Exhibit 3.

35. As part of the consideration for Mr. DiFilippo's employment, Asurint granted him one Class C Share in the company. That share equals 0.917% of the company's Class C membership units. Mr. DiFilippo owns this share to this day.

36. Mr. DiFilippo's job title at Asurint was Director of Data Integration and Senior Database Administrator. In that role, Mr. DiFilippo was responsible for creating and maintaining all of the myriad data sources used by Asurint's proprietary background screening application. He also managed a team of developers that acquired and converted the data sources, and additionally supported the development team in maintenance of the data other programming needs.

37. In connection with his hiring, and as a condition of his employment, on March 14, 2006, Mr. DiFilippo signed the Non-Competition and Non-Disclosure Agreement (Exhibit 2) consistent with his obligations in the NDA.

38. In addition to non-competition and non-competition covenants, the Agreement contained provisions protecting the ownership of Asurint's trade secrets, including confidential and proprietary information and trade secrets.

39. Under section 4 of the Agreement, Mr. DiFilippo made the following contractual promises and agreed to the following covenants regarding

-10-

Asurint's trade secrets, including other confidential and proprietary

information:

4.   Non-Disclosure of Confidential Information.

4.l Employee recognizes and acknowledges that during the
course of his or her employment, he or she will be in close
contact with confidential information pertaining to the business,
products, plans and affairs of Employer that is not readily
available to the public, that he or she has a duty not to disclose
any such confidential information to any Person that is not
expressly authorized in writing by an executive officer of
Employer to receive such information, and that any information:
(A) of a business nature including, but not limited to, all trade
secrets, capabilities, technical information, know-how, process
technology, methods, processes, procedures, policies, data, files,
books, records, designs, drawings, computer software, hardware,
specifications services, fees, budgets, profits, strategic planning,
research and development, marketing, merchandising and
financial condition relating to or used in connection with the
business of Employer; and (B) that pertains to the customers
and suppliers of, and investors in, Employer including, but not
limited to, customer lists (including, without limitation, contact
names, addresses, telephone numbers and purchasing and
payment history), supplier lists (including, without limitation,
contact names, addresses, telephone numbers and purchasing
and payment history), investor lists (including, without
limitation, contact names, addresses, telephone numbers and
investment history) and relations with and development of such
customers,  suppliers and investors, the management and other
details of the particular needs of such customers and suppliers,
and the business, affairs, taxes and financial condition of such
customers, suppliers and investors (all of the foregoing being
collectively referred to as "*Confidential Information*"), are
valuable, special and unique assets of Employer.

4.2 Employee agrees that he or she shall keep secret, and not
use for the benefit of himself or herself or others without the
advance written consent of the President of Employer, any and
all Confidential Information learned or acquired by Employee at
any time whatsoever.  Notwithstanding the foregoing, this
Section 4.2 shall not apply to any such Confidential Information
that:  (A) becomes generally available to the public through no

-11-

fault of Employee; or (B) Employee is required, in the opinion of legal counsel, to disclose by law.

40. Mr. DiFilippo also made certain promises and agreed to certain covenants in the Agreement regarding the ownership of intellectual property developed or worked on while employed by Asurint. In short, all such property belonged to Asurint, and Mr. DiFilippo agreed to relinquish any and all rights in such property.

41. Specifically, the Agreement provided:

6. Work Product.

6.1 "*Work Product*" shall mean any and all programs, policies, procedures, strategies, advice, reports, studies, surveys, letters, documents, drawings, designs, sketches, processes, computer software, computer hardware, inventions, discoveries, formulas, processes, designs, algorithms, derivative works and other useful information, know-how and the like that Employee may conceive of, suggest, make, invent, develop, implement or otherwise discover during the course of his or her employment with Employer (whether individually or jointly with any other person or persons) or relating in any way to any aspect of the Company Business.

6.2 (A)    Employee acknowledges and agrees that any and all Work Product shall be the exclusive property of Employer.

(B)    All Work Product shall be deemed works made for hire and as such Employer owns all copyrights, ***patent rights***, trade secrets, trademarks and all other rights and protections with respect thereto, and to the extent that any Work Product may not constitute works made for hire, Employee hereby conveys, assigns and sets over to Employer all rights, title and interests in, to and under such Work Product, including, without limitation, all copyrights, ***patent rights***, trade secrets, trademarks and all other rights and protections with respect thereto, which Employer may perfect in its own name as Employer may desire, in perpetuity or for the longest period otherwise permitted by law. (Emphasis added).

-12-

{K0226630.1}

(C)     Employee agrees from time to time, without further consideration, to execute such documents and otherwise cooperate with Employer as necessary in order for Employer to perfect its right, title and interest in, to and under such Work Product and any copyrights, ***patent rights***, trade secrets, trademarks and all other rights and protections with respect thereto, provided that Employer shall bear all out-of-pocket expenses relating to the same. (Emphasis added).

6.3  Upon the request of Employer at any time during Employee's employment by Employer or any time after the termination thereof, Employee shall immediately deliver to Employer any and all data storage media, data storage devices, documents, plans, algorithms, reports, letters, memoranda, diaries, notes, records, manuals, drawings, blueprints, sketches and all other writings, recordings and materials made or compiled by, or delivered or made available to, or otherwise obtained by Employee, together with any and all copies, notes, excerpts, summaries, abstracts, photographs or reproductions thereof, and that are then in Employee's possession or under Employee's control and that contain or relate to (A) any Work Product or (B) any other trade secrets or other Confidential Information that Employee has obtained as the result of his or her employment by Employer.  In such event, Employee shall certify to Employer in writing that Employee has fully complied with his or her obligation under this Section 6.3.

6.4  Employee acknowledges that Employer is not entering into this Agreement in order to obtain information that is property of any former or concurrent employer of Employee or any other person for whom Employee has performed services. Employee agrees not to improperly use or disclose any proprietary information or trade secrets of Employee's former or concurrent employers or such other persons, if any, in connection with his or her employment.

42. In the Agreement, Mr. DiFilippo also made certain promises and

agreed to certain covenants in the event that he breached the

Agreement:

- He agreed that the "rights and obligations set forth in this Agreement are special, unique and of extraordinary character." (Agreement § 5.1).

-13-

- He agreed that the Agreement was "reasonable in scope and duration and that such limitations are reasonably related to the protection of Employer's Confidential Information, legitimate business interests and goodwill." (Agreement § 5.1).

- He agreed that in the event of a breach of the Non-Disclosure of Confidential Information covenants, Asurint would have the right to obtain injunctive relief, and to receive all compensation, profits or other benefits derived or received by Mr. DiFilippo as the result of any breach. (Agreement § 5.1(B))

43. In addition to the Agreement, which specifically bound Mr. DiFilippo and sets forth his responsibilities and limitations regarding Asurint's trade secrets and confidential and proprietary information, Asurint also published to its employees—including Mr. DiFilippo—an employee handbook. A copy of the handbook is attached as Exhibit 4.

44. The handbook sets forth Asurint's expectations regarding its employees' handling of its confidential information:

> The confidentiality of our operations and customer information is a vital component contributing to the Company's growth. It creates a trusting relationship, which provides the basis for good customer relations.

> In addition to being a good business practice, in many instances, confidentiality is a legal requirement. Both legal and operational problems can result from unwarranted disclosure of customer or Company confidential information to the public (or a competitor). In each case, the person requesting information—be it a client, employee, corporate employee or outsider—must clearly demonstrate that he has the need to know, not just the desire to know, and have obtained appropriate legal documents (i.e., signed release from employee or customer) where required.

> *Note: Disclosure of confidential information is a serious breach of this trust relationship and may be grounds for immediate dismissal.*

(Exhibit 4 at pp. 20-21).

-14-

45. Separately, the handbook also sets forth employees'—including Mr. DiFilippo's—expectations and responsibilities regarding its computers and computer systems. That policy provides, in relevant part:

> *Company Property*: The Company has a Voice Mail system, an E-Mail system, and Internet capabilities and fax machines, which may be available to all Company personnel. These systems are the property of the Company and are to be used exclusively for Company business.

> *Compliance with Law*: Use of the systems must comply with the law. Violations of applicable laws may result in civil or criminal prosecution. Violations of this policy will be subject to disciplinary action up to and including termination.

> *Confidentiality, Privacy and Monitoring:* Neither Voice nor E-Mail systems provide complete confidentiality and the Company has the capability and the right to enter either system and retrieve messages if necessary. Employees should be aware that electronic communications could, depending on the technology, be forwarded, intercepted, printed, and stored by others. In addition, others can access electronic communications in accordance with this policy. You should not expect that anything which you send or receive using the Company's electronic communications systems and equipment is your private property.  In fact, it belongs to the Company. **You should not have any expectation of privacy with respect to those communications.**

> The Company reserves the right to monitor an individual's Voice or E-Mail mailboxes at any time. Your use of the systems will constitute consent to the Company's monitoring. No prior notification will be made to the individual who is assigned to the Voice or E-Mailbox. Situations where monitoring would be necessary include, but are not limited to, the following:

> • In order to ensure timely responses to customer needs, if an individual is out of the office for meetings, illness, vacation or any other reason and there is concern that messages are sitting in Voice or E-mail that may need attention, those Voice and E-Mailboxes may be screened.

-15-

- To investigate a possible violation of Company policies including harassment, inappropriate and/or excessive personal use of the systems or inappropriate messages being sent through the systems.

- When an individual is leaving the Company.

*Confidential Information:*  All employees are required to protect OST trade secrets and other proprietary, confidential information. Company trade secrets or confidential information should never be transmitted or forwarded to individuals or institutions not authorized to receive the information. Employees may not use Company systems to copy or distribute copyrighted material (e.g., software, database files, documentation, or articles).

(Exhibit 4 at pp. 24-25).

46. Asurint provided Mr. DiFilippo a copy of its handbook, and he signed a document acknowledging his receipt. A copy of Mr. DiFilippo's signed receipt is attached as Exhibit 5.

47. From March 2006 until he quit his job in August 2008, Asurint employed Mr. DiFilippo as its Database Administrator and as part of its Data Acquisition Team. In that position, and pursuant to and because of the covenants in the Agreement covering, pertaining to, and protecting Asurint's trade secrets, including confidential and proprietary information, Asurint granted Mr. DiFilippo direct access to, and provided information about, all developments and improvement to Asurint's proprietary iMARC Technology.

*Mr. DiFilippo Steals Asurint's Trade Secrets*

48. On July 28, 2008, Mr. DiFilippo abruptly resigned from Asurint. A copy of his resignation letter is attached as Exhibit 6.

-16-

49. A mere seven weeks after he quit, on September 18, 2008, Mr. DiFilippo filed with the United States Patent and Trademark Office a provisional patent application, and six months later a patent application (the "Patent Application," a copy of which is attached as Exhibit 7).

50. According to the Patent Application, the patent sought is as follows:

> A technique for conducting criminal background investigations addresses the problems of false negatives; false positives; and offense severity. The foregoing problems are managed by pre-scoring records within a data management system and comparing these scores with initial criteria. The resulting values are quickly returned using minimum real-time computational power. A result score is represented by three distinct values or three dimensions which can easily be represented by any 3-D graphical display or easily sorted highest to lowest for each dimension.

51. In material terms, the Patent Application discloses Asurint's trade secrets and, in essence, is an application for a patent of the iMARC Technology, which Asurint invented, developed, created, and owns.

52. All of the claimed patentable subject matter set forth in the Patent Application was invented and developed by Asurint.

53. Asurint employees other than Mr. DiFilippo invented iMARC; Asurint disclosed iMARC to Mr. DiFilippo pursuant to the protections of the NDA and the Agreement; Asurint's employees further developed, refined, and improved iMARC in the course of their employment by Asurint. At all times, all inventors—including Mr. DiFilippo—were obligated under the Agreement to maintain the confidence of Asurint's trade secrets, including other confidential and proprietary information, and pursuant to the Agreement

-17-

Asurint owns all patent, trade secret, and other property rights in and to any employee work product, including iMARC.

54. In addition to hiding the genesis and authorship of iMARC and its underlying technology, Mr. DiFilippo is also attempting to hide the fact that he ever worked for Asurint. As of the date of the filing of this Complaint, Mr. DiFilippo's LinkedIn profile (a copy of which is attached as Exhibit 8) makes no mention of Asurint as a past employer or otherwise. In fact, the profile lists him as working for Jones Day from 2005 – 2007, and omits any employment subsequent to Jones Day.

55. The fictitious employment history, coupled with the Patent Application, suggest that Mr. DiFilippo is attempting to hide his past relationship with Asurint to cover-up the fact that he is not the inventor of the subject matter of the Patent Application.

56. The bogus LinkedIn profile and misrepresented inventorship of the technology in the Patent Applications are not Mr. DiFilippo's sole acts of deception. Once Asurint learned of the theft of its trade secrets, Asurint discovered that prior to Mr. DiFilippo's resignation he erased from his Asurint issued and owned computers any and all email files prior to 2008. Mr. DiFilippo lacked authorization to delete this information. Asurint has not been able to recover any emails that predate Mr. DiFilippo's resignation.

57. Upon information and belief, Mr. DiFilippo copied from Asurint's computer systems trade secrets, including confidential and proprietary

-18-

information, relating to the research and development of iMARC. Mr.

DiFilippo lacked authorization to abscond with the secrets and confidences.

## Count I:
### Declaratory Judgment of Inventorship and Ownership
### Pursuant to 28 U.S.C. § 2201

58. Asurint repeats and realleges the allegations set forth in the preceding paragraphs.

59. As a result of Mr. DiFilippo's actions, there is a substantial and continuing justiciable controversy between Asurint and Mr. DiFilippo regarding the ownership and inventorship of the provisional patent application and patent application filed by Mr. DiFilippo for the iMARC Technology.

60. Mr. DiFilippo agreed, in writing and as a condition of his employment, that he had conveyed, assigned, and set over all rights, title, and interests in, any inventions or improvements on Asurint's technology, inventions, or products, conceived, developed, or reduced to practice while in Asurint's employ.

61. Asurint seeks a declaratory judgment that Asurint owns the Patent Application filed by its former employee, Mr. DiFilippo, in addition to any patents that may issue therefrom.

62. As a result of Mr. DiFilippo's assistance in the development of inventions and improvements on Asurint's technology during the course of his employment with Asurint, and pursuant to his agreement to assign any

-19-

such inventions to Asurint, Asurint is the rightful owner of said inventions and improvements pursuant to the Patent Laws of the United States, 35 U.S.C. §§ 1 – 376, and Ohio law, including the invention described and claimed the Patent Application.

63. Asurint further seeks a declaration regarding the inventorship of the Patent Application, including the invention described and claimed in the Patent Application, in which Asurint and its employees were the inventor of the subject matter described in the Patent Application.

64. To the extent that any patents issue from the Patent Application, Asurint further seeks a declaration regarding the inventorship of the patent.

65. By reason of the aforementioned actions, Asurint will be irreparably harmed if, among others, Mr. DiFilippo is permitted to continue the prosecution of the Patent Application without Asurint being allowed to solely and exclusively control the prosecution as the true and rightful owner.

66. Asurint requests a judicial determination and declaration of the respective rights and duties of the parties herein that Asurint is the owner of the Patent Application filed by Mr. DiFilippo. Such determination and declaration is necessary and appropriate at this time to ensure that the parties can ascertain their respective rights and duties regarding the Patent Applications or any patent that issues therefrom.

## Count II:
## Violation of Section 43(a) of the Lanham Act

67. Asurint repeats and realleges the allegations set forth in the preceding paragraphs.

68. The statements by Mr. DiFilippo in the Patent Application that he is the sole inventor of the inventions set forth are false or misleading description of fact, or false or misleading representation of fact, that were likely to cause, and in fact did cause, confusion or mistake, or were likely to deceive, and in fact did deceive, as to the affiliation, connection, or association of Mr. DiFilippo as the inventor of iMARC, in violation of § 43(a) of the Lanham Act.

69. Mr. DiFilippo's misrepresentations regarding the invention set forth in the Patent Application, knowing the statements to be false, misrepresented the nature, characteristics or qualities of those goods and services in interstate commerce, in violation of § 43(a) of the Lanham Act.

70. These misrepresentations were material, and actually deceived, were intended to deceive, or have a tendency to deceive a substantial segment of their audience.

71. Mr. DiFilippo's unlawful acts have caused loss and harm to Asurint's business, and entitle it to the recovery of damages.

72. Mr. DiFilippo's unlawful acts have caused and continue to cause irreparable injury to Asurint's business for which it has no adequate remedy at law, entitling it to injunctive relief.

-21-

73. Asurint is also entitled to the recovery of money damages, multiple damages, and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117(a).

## Count III:
## Unfair Competition

74. Asurint repeats and realleges the allegations set forth in the preceding paragraphs.

75. Mr. DiFilippo's actions, including but not limited to his deceptive acts, use and, disclosure of Asurint's trade secrets, constitute unfair competition.

76. Mr. DiFilippo's unfair competition has caused loss and harm to Asurint's business, and entitles it to the recovery of monetary damages.

77. Mr. DiFilippo's unfair competition has caused and continues to cause irreparable injury to Asurint's business for which it has no adequate remedy at law, entitling it to injunctive relief.

## Count IV:
## Breach of Contract

78. Asurint repeats and realleges the allegations set forth in the preceding paragraphs.

79. Pursuant to the terms of the Agreement between Asurint and Mr. DiFilippo, Mr. DiFilippo agreed to maintain the confidentiality of Asurint's trade secrets, including other confidential and proprietary information, and to disclose and assign to Asurint any inventions he conceived and/or reduced to practice during his employment.

{K0226630.1}

80. Asurint has a protectable interest in the information protected under its contract with Mr. DiFilippo.

81. Asurint fully performed under the terms of the contract by providing Mr. DiFilippo the consideration of employment with the company and all compensation and benefits owed thereto.

82. Mr. DiFilippo breached the contract by disclosing Asurint's trade secrets, including other confidential and proprietary information, to the public via publication of the Patent Application, and by failing to disclose and/or assign to Asurint any inventions he conceived and/or reduced to practice during his employment.

83. As a result of Mr. DiFilippo's conduct, Asurint has suffered injury and damage in an amount to be proven at trial.

### Count IV:
### Violation of Ohio Uniform Trade Secrets Act,
### O.R.C. §§ 1333.61 – 1333.69

84. Asurint repeats and realleges the allegations set forth in the preceding paragraphs.

85. At all times relevant, Asurint has maintained its confidential and proprietary information and "trade secrets" within the meaning of the Ohio Uniform Trade Secrets Act, O.R.C. §§ 1333.61 – 1333.69.

86. While in the employ of Asurint, Mr. DiFilippo had access to and knowledge of Asurint's trade secrets, including other confidential and proprietary information, including the iMARC Technology.

-23-

87. Mr. DiFilippo has already disclosed the trade secrets, including other confidential and proprietary information, of Asurint, with the knowledge that the information constituted "trade secrets" and proprietary, technical, and confidential business information belonging to Asurint, and which he acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use in violation of Mr. DiFilippo's duties to maintain the secrecy of the confidential information and trade secrets, and thereby misappropriated said information and trade secrets.

88. Mr. DiFilippo misappropriated the aforementioned trade secrets, including other confidential and proprietary information, to compete unfairly with and harm Asurint.

89. Mr. DiFilippo used Asurint's trade secrets, including other confidential and proprietary information, as the basis for the provisional and Patent Application without Asurint's consent, and to promote and assist his own interests.

90. Mr. DiFilippo is attempting to commercially use Asurint's trade secrets, including other confidential and proprietary information, for his own benefit, without Asurint's consent and to the exclusion of Asurint's benefit.

91. As a direct and proximate result of Mr. DiFilippo's aforementioned actions, including his breaches of duty, and his misappropriation, disclosure, or use of Asurint's trade secrets, including other confidential and proprietary information, Asurint has been damaged and will continue to be damaged.

{K0226630.1}

92. Because Mr. DiFilippo's conduct was willful, malicious, outrageous, deliberate, and made with full knowledge of, and total disregard for, Asurint's rights, punitive damages against Mr. DiFilippo are justified.

## Count V:
## Conversion

93. Asurint repeats and realleges the allegations set forth in the preceding paragraphs.

94. Mr. DiFilippo wrongfully converted into his own name Asurint's intellectual property rights in the inventions relating to the iMARC Technology.

95. Mr. DiFilippo has personally benefited from the above-said conversion of Asurint's rights in this invention.

96. Asurint has been damaged by Mr. DiFilippo's wrongful conversion.

97. Because Mr. DiFilippo's conduct was willful, malicious, outrageous, deliberate, and made with full knowledge of, and total disregard for, Asurint's rights, punitive damages against Mr. DiFilippo are justified.

## Count VI:
## Unjust Enrichment

98. Asurint repeats and realleges the allegations set forth in the preceding paragraphs.

99. Mr. DiFilippo has been unjustly enriched at the expense of Asurint by the unlawful use of Asurint's intellectual property rights in the

{K0226630.1}

aforementioned invention, including the above-described wrongful appropriation of Asurint's rights in the provisional and Patent Application.

## Count VII:
## Breach of the Duty of Loyalty

100. Asurint repeats and realleges the allegations set forth in the preceding paragraphs.

101. As an employee of Asurint, during his employment Mr. DiFilippo owed Asurint a duty to act in the utmost good faith and loyalty toward it.

102. By misappropriating Asurint's proprietary and confidential information and trade secrets for his own purpose, Mr. DiFilippo acted in bad faith and contrary to the interests of Asurint.

103. Asurint has been damaged by Mr. DiFilippo's disloyal conduct and breach of his duty of loyalty.

104. Because Mr. DiFilippo's conduct was willful, malicious, outrageous, deliberate, and made with full knowledge of, and total disregard for, Asurint's rights, punitive damages against Mr. DiFilippo are justified.

## Count VIII:
## Breach of Fiduciary Duty

105. Asurint repeats and realleges the allegations set forth in the preceding paragraphs.

106. As a result of Mr. DiFilippo's ownership of a membership interest in Asurint, Mr. DiFilippo owed the company a fiduciary duty.

{K0226630.1}

107. By misappropriating Asurint's proprietary and confidential information and trade secrets for his own purpose, Mr. DiFilippo breached his fiduciary duty to Asurint.

108. Asurint has been damaged by Mr. DiFilippo's breach of his fiduciary duty.

109. Because Mr. DiFilippo's conduct was willful, malicious, outrageous, deliberate, and made with full knowledge of, and total disregard for, Asurint's rights, punitive damages against Mr. DiFilippo are justified.

### Count IX:
### Violation of the Computer Fraud and Abuse Act,
### 18 U.S.C. § 1030(a)(2)(C)

110. Asurint repeats and realleges the allegations set forth in the preceding paragraphs.

111. Mr. DiFilippo intentionally accessed Asurint's protected computers, without authorization or by exceeding his authorized access, to obtain information, in violation of 18 U.S.C. § 1030(a)(2)(C).

112. By means of this conduct, Mr. DiFilippo improperly misappropriated Asurint's valuable, confidential and proprietary information and trade secrets.

113. The computers improperly accessed by Mr. DiFilippo are used in, or affect, interstate or foreign commerce or communication and are, therefore, protected computers under 18 U.S.C. § 1030(e)(2)(B).

{K0226630.1}

114. Mr. DiFilippo's unauthorized accessing of these protected computers has caused Asurint to suffer losses on each such occasion, including but not limited to the cost of responding to each offense, conducting a damage assessment, revenue lost and costs incurred.

115. Mr. DiFilippo's unauthorized accessing of these protected computers has caused Asurint to suffer damages on each such occasion, including but not limited to impairment to the integrity or availability of data, a system, or information.

116. Pursuant to 18 U.S.C. § 1030(g), Asurint is entitled to compensatory damages, injunctive relief and other equitable relief.

**Count X:**
**Violation of the Computer Fraud and Abuse Act,**
**18 U.S.C. § 1030(a)(5)(B) and 1030(a)(5)(C)**

117. Asurint repeats and realleges the allegations set forth in the preceding paragraphs.

118. Prior to his resignation from Asurint, Mr. DiFilippo intentionally accessed his own protected computer without authorization, and deleted all pre-2008 emails from his Asurint-owned email account, which resulted in the impairment of the integrity or availability of the data, programs, systems, or information in such account.

119. As a result of this deletion and Mr. DiFilippo's misconduct, Asurint suffered loss in that, among other things, Asurint incurred reasonable costs, including, but not limited to, the cost of responding to the offense, conducting

a damage assessment, in an amount to be proved at trial but that exceeds $5,000.

120. Mr. DiFilippo was not authorized to delete emails because at the time of this conduct, he was misappropriating proprietary, confidential, sensitive business information and trade secrets for his own benefit.

121. The computers improperly accessed by Mr. DiFilippo are used in, or affect, interstate or foreign commerce or communication and are, therefore, protected computers under 18 U.S.C. § 1030(e)(2)(B).

122. Mr. DiFilippo's unauthorized accessing of these protected computers violated 18 U.S.C. § 1030(a)(5)(B) and 18 U.S.C § 1330 (a)(5)(C) of the Computer Fraud and Abuse Act.

123. Pursuant to 18 U.S.C. § 1030(g), Asurint is entitled to compensatory damages and/or injunctive relief for Mr. DiFilippo's violations of the Computer Fraud and Abuse Act.

## Count XI:
## Spoliation of Evidence

124. Asurint repeats and realleges the allegations set forth in the preceding paragraphs.

125. Prior to Mr. DiFilippo's resignation, litigation between Mr. DiFilippo and Asurint was probable, as Mr. DiFilippo was actively engaged in the misappropriation of Asurint's confidential and proprietary information and trade secrets.

{K0226630.1}

126. Prior to his resignation, Mr. DiFilippo knew or should have known that litigation between him and Asurint was probable because of his active misappropriation of Asurint's confidential and proprietary information and trade secrets.

127. Prior to his resignation, Mr. DiFilippo willfully destroyed evidence via the deletion of emails from his Asurint email account, for the purpose of hiding his misappropriation of Asurint's confidential and proprietary information and trade secrets, and disrupting the probable civil action resulting from that unlawful conduct.

128. Asurint's prosecution of this action has been hampered because it has been unable to fully discover the nature of Mr. DiFilippo's activities during his employment.

129. Asurint has been damaged by Mr. DiFilippo's willful spoliation of evidence.

130. Because Mr. DiFilippo's conduct was willful, malicious, outrageous, deliberate, and made with full knowledge of, and total disregard for, Asurint's rights, punitive damages against Mr. DiFilippo are justified.

Wherefore, Asurint respectfully demands judgment in its favor and against Mr. DiFilippo and prays for:

A.  A permanent injunction restraining Mr. DiFilippo, and anyone in active concert with him:

    i.    from engaging in all activities prohibited by the Agreement, including but not limited to using, retaining, or disclosing any confidential information and/or trade secrets which he obtained during his employment with Asurint;

    ii.    from engaging in all activities prohibited by the Ohio Uniform Trade Secrets Act; and

    iii.    from falsely representing that Mr. DiFilippo is the owner of the information, documents, and Patent Application filed by Mr. DiFilippo, or any patents that issue therefrom;

B.  An injunction requiring Mr. DiFilippo

    i.    to execute all documents, including assignment and power of attorney forms, necessary and convenient before the United States Patent and Trademark Office to certify that Asurint is the owner of and sole and exclusive prosecuting party for Patent Application filed by Mr. DiFilippo, or patents issued therefrom; and

    ii.    to return to Asurint immediately all originals and copies of documents and notes that contain any confidential or proprietary information or trade secrets of Asurint;

C.  A judicial determination and declaration that Asurint is the owner of the information, documents, and Patent Application filed by Mr. DiFilippo, and any continuations, continuations-in-part, divisionals, or patents issued therefrom;

D.  An Order from the Court correcting the Patent Application to reflect that Mr. DiFilippo is not the inventor of any inventions related to Asurint's confidential or proprietary information or trade secrets, and any continuations, continuations-in-part, divisionals, or patents issued therefrom;

E.  An Order imposing a constructive trust for the benefit of Asurint on the patent applications and/or patents referenced above;

F.  Such damages as Plaintiff Asurint has sustained as a result of:

i.  Mr. DiFilippo's breach of the contract entered into by Mr. DiFilippo and Asurint;

ii.  Mr. DiFilippo's knowing, willful violations of the Lanham Act, 15 U.S.C. § 1125(a);

iii.  Mr. DiFilippo's breach of confidence and misappropriation of Asurint's confidential information and trade secrets;

iv.  Mr. DiFilippo's conversion of Asurint's intellectual property rights in the inventions referenced herein;

v.  Mr. DiFilippo's unjust enrichment at the expense of Asurint;

vi.  Mr. DiFilippo's unfair competition;

vii.  Mr. DiFilippo's breach of the duty of loyalty;

viii.  Mr. DiFilippo's breach of fiduciary duty;

ix.  Mr. DiFilippo's violations of the Computer Fraud and Abuse Act; and

x.  Mr. DiFilippo's spoliation of evidence;

{K0226630.1}

G. An adverse inference that any emails deleted by Mr. DiFilippo would be favorable to the positions advanced by Asurint in this litigation;

H. As a result of Mr. DiFilippo's breach of fiduciary duty, an order requiring Mr. DiFilippo return to Asurint his 0.917 units of membership interest in the company;

I. Punitive damages in an amount to be determined by the jury;

J. Prejudgment and post-judgment interest;

K. An assessment of costs against Mr. DiFilippo;

L. An award of attorneys' fees against Mr. DiFilippo; and

M. Whatever additional relief this Court deems just and proper.

Respectfully submitted,

**KOHRMAN JACKSON & KRANTZ P.L.L.**

s/Jonathan T. Hyman
BRETT S. KRANTZ (0069238)
JONATHAN T. HYMAN (0068812)
One Cleveland Center, 20th Floor
1375 East Ninth Street
Cleveland, OH 44114
Phone: 216-696-8700
Fax: 216-621-6536
bk@kjk.com
jth@kjk.com

*Attorneys for Plaintiff*
*One Source Technology, LLC dba Asurint*

{K0226630.1}

## Jury Demand

Plaintiff hereby demands trial by jury of all issues so triable in this action.

s/Jonathan T. Hyman
BRETT S. KRANTZ (0069238)
JONATHAN T. HYMAN (0068812)
One Cleveland Center, 20th Floor
1375 East Ninth Street
Cleveland, OH 44114
Phone: 216-696-8700
Fax: 216-621-6536
bk@kjk.com
jth@kjk.com

*Attorneys for Plaintiff*
*One Source Technology, LLC dba Asurint*

-34-